# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT KNOXVILLE

JOE MAYNARD and WANDA MAYNARD,   )
    Plaintiffs,   )
  )
v.   )     No.  3:09-CV-334
  )     (Phillips)
CITIFINANCIAL AUTO CREDIT, INC., and   )
DYNAMIC RECOVERY SERVICES, INC.,   )
    Defendants.   )

## <u>MEMORANDUM AND ORDER</u>

Plaintiffs have brought this action under the Fair Debt Collections Practices Act and under Tennessee state law. The Maynards assert several claims as follows: gross negligence, violation of federal and state consumer protection statutes, negligent failure to train and supervise employees, intentional infliction of emotional distress, negligent infliction of emotional distress, violation of the Fair Debt Collections Practices Act, and loss of consortium. The parties conducted mediation on July 15, 2011, and reported to the court that all of plaintiffs' claims were settled. However, there remains pending Citifinancial's motion for summary judgment on its cross-claim against defendant Dynamic Recovery Services, Inc.

CitiFinancial states that pursuant to the agreement between CitiFinancial and DRS, DRS was required to provide services in a professional manner and to comply with all applicable laws. DRS was also required to indemnify and hold CitiFinancial harmless

for any claimed breach of their agreement.  DRS, on the other hand, states that plaintiffs have asserted claims against CitiFinancial based on CitiFinancial's conduct, separate and independent from DRS's conduct.  DRS admits that it is required to indemnify CitiFinancial for actions undertaken by DRS employees.  Thus, in order to address CitiFinancial's counterclaim, it is necessary for the court to determine whether CitiFinancial's actions violated any applicable laws.

## I.   Factual Background

CitiFinancial is a financial services company that provides consumer lending primarily for the consumer purchase of vehicles.  Plaintiffs Joe Maynard and Wanda Maynard purchased a used 2003 Ford F350 pickup truck from Metro Ford Mercury in Lenoir City, Tennessee on or about May 7, 2005.  The contract was financed through CitiFinancial, and the Maynards were directed to forward their monthly payments to CitiFinancial.

The Maynards regularly made their payments with some exceptions where they were late with their payments.  Joe Maynard was diagnosed with lung cancer on September 29, 2006, and subsequently underwent lung surgery.  In October 2006, the Maynards were behind on their payments, and when contacted, Wanda Maynard advised CitiFinancial that her husband had been diagnosed with lung cancer and was not able to work. Wanda Maynard spoke with a CitiFinancial representative regarding options because she was unable to work at that time as well.  According to CitiFinancial's records, Wanda Maynard was advised that CitiFinancial could not refinance the vehicle because it was a

direct lender and perhaps a local bank might be able to refinance the vehicle. The Maynards were able to forward payments on November 6, 2006, November 23, 2006, and December 25, 2006.

Subsequently, the Maynards made payments, albeit late, for January, February and March of 2007; however, they were unable to make payments for April or May of 2007. According to CitiFinancial's records, a CitiFinancial representative contacted Wanda Maynard, and she requested that CitiFinancial grant them a deferment of two months. CitiFinancial approved the deferment on May 4, 2007.

CitiFinancial's records reflect that the Maynards made the June payment late on July 16, 2007. The July payment was not paid in full, but a payment was made on August 6, 2007. The August payment was paid on September 3, 2007, and the September payment was paid on October 8, 2007.

The Maynards were contacted in early November regarding the October payment, and they advised CitiFinancial that they had no money. CitiFinancial followed up on November 15, 2007, and Wanda Maynard advised them that she had just been laid off and her husband had not worked in over a year. CitiFinancial followed up with the Maynards on December 6, 2007, and Wanda Maynard advised that they could not afford to keep the truck and they wanted to surrender it. At that point, the Maynards were 47 days past due on a payment. However, on December 11, 2007, Wanda Maynard asked what options were available for them to keep the vehicle. CitiFinancial advised her that it would

3

need proof of income and expenses. On December 20, 2007, CitiFinancial followed up and left a message on the Maynards' answering machine. On December 24, 2007, a CitiFinancial representative called Wanda Maynard who advised that she was still waiting on proof of her husband's disability income.

On December 31, 2007, CitiFinancial received proof of income and expenses from the Maynards. CitiFinancial called the Maynards and spoke to Joe Maynard who advised that Wanda was handling the matter and he would have her call. The CitiFinancial representative advised him that an amendment had been approved and they would need to post a payment.

On January 2, 2008, CitiFinancial contacted the Maynards and spoke to Wanda Maynard. She was advised of the approved loan amendment terms and that she would have to make a payment of $749.21 in order to have the loan amendment go into effect. At this point, the Maynards had not made a payment on the vehicle since October 8, 2007. On January 7, 2008, Wanda Maynard called CitiFinancial, and she was advised of the approved amended terms and that they would need to make a payment. Wanda advised she would discuss the matter with Joe and call back. On January 9, 2008, Wanda Maynard called CitiFinancial and advised that they did want the amendment and to keep the vehicle, but they had been advised that Joe's disability would not include medical coverage. CitiFinancial advised her that it had approved writing off $3,570.43 of the principal amount so that $24,681.81 was the new principal balance. CitiFinancial also advised Wanda Maynard that the new payment amount would be $435.00. On January 12,

4

2008, CitiFinancial called the Maynards and spoke to Wanda and went over the approved terms. She advised she would discuss with Joe and call back on Monday.

On January 16, 2008, CitiFinancial called the Maynards and spoke to Wanda. She advised that she had discussed the amendment with her husband and they decided to surrender the vehicle rather than amend the loan. The CitiFinancial representative explained the process and ramifications, and Wanda Maynard said that she understood. At this point, the Maynards had not made any payments for over eighty days. On January 17, 2008, CitiFinancial ordered the repossession, and the vehicle was repossessed that day with the Maynards' knowledge and approval. On January 17, 2008, CitiFinancial sent each of the Maynards letters advising of its intent to sell the vehicle. The letters advised that the money received from the sale of the vehicle would be applied to the amount owed, and if there was a balance remaining, the Maynards would be responsible for it.

On March 28, 2008, a CitiFinancial representative called the Maynards and spoke to Joe Maynard to advise that the vehicle had been sold. The representative advised that he could attempt to negotiate a reduced amount from the balance as satisfaction in full, but Joe Maynard refused and hung up. However, Joe Maynard called back and asked if CitiFinancial would accept thirty percent of the remaining balance as satisfaction in full, and he advised that he would need some time to obtain the funds. On April 1, 2008, CitiFinancial sent each of the Maynards letters advising that it had sold the vehicle for $18,000.00 leaving a balance of $12,479.02.

5

On April 8, 2008, CitiFinancial contacted the Maynards, and Wanda Maynard advised that they could not come up with the amount owed. The representative advised that CitiFinancial could reduce the balance to twenty-five percent and split it into two payments, and would follow up in a week. A CitiFinancial representative attempted to reach the Maynards on April 24, 2008 and May 19, 2008. On May 27, 2008, a representative called and talked to Wanda Maynard. She advised that they could not even pay the twenty-five percent because of their health insurance costs of $800.00 per month, and they were living solely on her husband's Social Security disability.

After a representative attempted to verify that Wanda Maynard was no longer employed by calling her former place of employment, CitiFinancial referred the matter to defendant Dynamic Recovery Services (DRS) on May 28, 2008. DRS and CitiFinancial entered into a collection agency agreement whereby DRS would provide collection services on behalf of CitiFinancial. The agreement provided that DRS was an independent contractor, and DRS was required to provide all services in a professional manner, and in compliance with all applicable laws. In addition, DRS was required to indemnify and hold CitiFinancial harmless for any claimed breach of the agreement by DRS.

On June 26, 2008, Denise Anderson, a collection representative with DRS called the Maynards and spoke with Joe Maynard. During the call, Joe Maynard became very upset when Anderson threatened to have the law come out on the following day and remove the Maynards from their home. Joe Maynard ended the conversation and told his wife that he could not breathe and that she needed to call 911. Before Wanda Maynard

6

could call 911, however, Anderson called back.  Wanda Maynard informed Anderson that her husband was unable to breathe and ended the conversation. An ambulance with emergency personnel arrived at the Maynards' home in response to Wanda Maynard's 911 call.  Joe Maynard was transported to a hospital where he was treated at the emergency room for a pneumothorax.

On that same day, DRS contacted CitiFinancial and requested that it approve a satisfaction in full for twenty-four percent of the outstanding balance, and CitiFinancial approved it on June 27, 2008.

Wanda Maynard gave a deposition in this matter on January 21, 2011. Wanda testified in her deposition that she understood that they would be obligated to pay the balance once the vehicle was sold.  In addition, she testified that but for the phone call on June 26, 2008, CitiFinancial employees always treated her respectfully and professionally.  She further testified that neither she nor her husband sought treatment for any emotional or mental disturbance resulting from the June 26 telephone call, but that she has experienced "stress" when the telephone rings because creditors (not the defendants) continue to call the Maynard home.

## II.  Motion to Strike

Defendant DRS has moved to strike Exhibits 1, 2 and 3, attached to plaintiffs' response to the motion for summary judgment because the affidavits contradict Wanda Maynard's earlier deposition testimony.  The court will first address defendants' motion to

strike because a decision on that motion will affect its decision on CitiFinancial's motion for summary judgment.

In her affidavit of May 4, 2011, Wanda Maynard stated that during calls made by representatives of defendants to her home "callers were always excessively forceful and unrelentlessly demanding . . . . They just kept calling and calling, and demanding and demanding." However, in her sworn deposition testimony in this matter on January 21, 2011, she stated:

Q    Okay. I want to focus on before you surrendered the truck. When you talked to people at CitiFinancial, how would you describe the conversations with them?

A    Agreeable.

Q    And they treated – would it be fair to say that they treated you, you know, in a professional manner?

A    Yes.

. . .

Q    When you had these conversations, were they pleasant with you, professional?

A    Yes.

Q    So was the day that his lung collapsed – do you remember the date?

A    Yes.

Q    What was it?

A    June 26.

Q    Of 2008?

A    Yes.

Q       Prior to that, had anybody been harassing or treated you unprofessionally?

A       No.

                                . . .

Q       I'm going to try to keep divided –

A       Okay.

Q       – what your experience is and what your husband's experience may have been.  If you spoke with Denise Anderson on any occasion before June 26, 2008, I take it, based on your responses to Ms. Thompson's questions, those conversations were all professional and courteous between the two of you.

A       Yes.

Q       You have no complaints about how those conversations proceeded?

A       No.


        In her affidavit of April 28, 2011, Wanda Maynard testified, "I asked the

Collection Representatives on more than one occasion to stop calling us."  However, in her

deposition, Wanda Maynard denied that she ever asked Denise Anderson to stop making

telephone calls to her home:

Q       Did you ever in a conversation with Denise Anderson before June 26, 2008, ever ask her to cease making any telephone calls?

A       No.


        In her affidavit of April 28, 2011, Wanda Maynard stated that, during the call

on June 26, 2008 with Denise Anderson, her husband "started breathing very hard and he

ended the conversation. He told me that he could not breathe and that I needed to call 911." This is directly contradicted by her deposition testimony. During her deposition, Wanda Maynard said she recalled no physical reaction, or hard breathing, by her husband during the call with Denise Anderson. Instead, Joe Maynard called his sister after speaking to Anderson, and then later began having breathing problems:

Q Okay. So they're on the phone for several minutes. And tell me what happened to conclude that conversation as you observed it.

A He said that he would – I guess she would call him back. He was going to try to find – you know, find a way to get the money. And she said that she would call him back.

Q Okay. Now, do you know that, or is that what he told you?

A That's what he told me.

Q So, what you heard was what?

A He was – he would just try to get the money. If they could get it that low, he would try to see if he could borrow the money to pay it.

Q Okay. And then when he said that, what happened next?

A They hung the phone up.

Q Okay. Now, when they hung the phone up – or prior to the time that your husband hung up the phone in that first conversation, did he say anything to her about his having any problems or was that later?

A You mean his, like breathing problems?

Q Yes, ma'am.

A That was – that was later after he hung up.

Q All right. So he wasn't experiencing those problems on the phone with her?

10

A      Not to my knowledge.

Q      At least he didn't tell you that he was?

A      Right.

Q      And you didn't observe anything along those lines?

A      No.

Q      So he hangs up. What happened next?

A      He was going to place a call to – I believe it was his sister – to see if she would loan him the money. And then I assume she told him yes. And then it was just – just maybe a minute or two later Denise called.

Q      Now, let me – did your husband, after getting off the phone with Denise in that first conversation, did he call his sister?

A      Yes.

Q      How long did they speak?

A      Probably a minute or two. It wasn't long.

Q      So, when he got off the phone with his sister, Denise called again?

A      Yes, but I answered.

Q      All right. Tell me what occurred in that conversation between you and Denise Anderson.

A      Not much. I answered the phone. She told me who she was. And I was in here, actually, at that freezer. And he was in the bedroom. And by the time I got her name wrote down, he told me he couldn't breathe, he had to – he knew, you know, he was going to have to have help.

Q      So you really didn't have much of a conversation with her at that point?

A      No.

Q    And that was the first time you were aware that your husband was experiencing breathing problems?

A    Yes.

Q    So your husband tells you he's having a hard time breathing. What did you tell Ms. Anderson?

A    I told her that – I said, "My husband is – he can't breathe."  I said, "I'm going to have to call – hang up and call 911."

Q    And did you do that?

A    Yes.

In her affidavit of May 5, 2011, Wanda Maynard stated that "Ms. Anderson called a few days later," as did another lady identified as an "authorized representative demanding money."  However, in her deposition testimony, Wanda Maynard testified that Denise Anderson called her back after the call on June 26, 2008, to see if her husband was alright, and to check on him.  Wanda Maynard characterized this second call from Denise Anderson as "professional" in her deposition.

Generally, a party may not file an affidavit that contradicts earlier deposition testimony in an attempt to create a factual issue.  *Reid v. Sears Roebuck and Co.,* 790 F.2d 453 (6th Cir. 1986).  If a witness, who has knowledge of a fact, is questioned during her deposition about that fact, she is required to "bring it out at the deposition and cannot contradict her testimony in a subsequent affidavit."  *Id.*   The court agrees that Wanda Maynard's affidavits, filed after her deposition, directly contradict her deposition testimony and "constitute an attempt to create a sham fact issue."  *See Areal, S.R.L. v. PCC Airfoils,*

*LLC*, 448 F.3d 899, 908 (6th Cir. 2006). Accordingly, defendant's motion to strike is **GRANTED**. The court has not considered the affidavits in deciding the pending motion for summary judgment.


### III.   Standard for Summary Judgment

Rule 56(c), Federal Rules of Civil Procedure, provides that summary judgment will be granted by the court only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. The burden is on the moving party to conclusively show that no genuine issue of material fact exists. The court must view the facts and all inferences to be drawn therefrom in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); *Morris to Crete Carrier Corp.,* 105 F.3d 279, 280-81 (6th Cir. 1987); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943 (6th Cir. 1990); *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987). Once the moving party presents evidence sufficient to support a motion under Rule 56, Federal Rules of Civil Procedure, the non-moving party is not entitled to a trial simply on the basis of allegations. The non-moving party is required to come forward with some significant probative evidence which makes it necessary to resolve the factual dispute at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986); *White,* 909 F.2d at 943-44. The moving party is entitled to summary judgment if the non-moving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof. *Celotex,* 477 U.S. at 323; *Collyer v. Darling,* 98 F.3d 220 (6th Cir. 1996).

## IV.   Fair Debt Collection Practices Act

The Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. § 1692, addresses the use of abusive, deceptive, and unfair debt collection practices.  Specifically, § 1692c concerns communication methods in connection with debt collection; § 1692d covers abusive and harassing conduct deemed unlawful in the collection of a debt; § 1692e details the use of false, deceptive and misleading representations that may not be used by debt collectors; and § 1692f addresses specific unfair and unconscionable means a debt collector may not employ to collect on a debt.

The stated purpose of the FDCPA is "to eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not completely disadvantaged, and to promote consistent state action to protect consumers against debt collection abuses." 15 U.S.C. § 1692e.   The FDCPA broadly prohibits debt collectors from engaging in harassing, oppressive or abusive conduct, from using false, deceptive and misleading representations, and from collecting debts through unfair or unconscionable means.  *See* 15 U.S.C. §§ 1692d, 1692e, 1692f.

## A.   CitiFinancial is not a "Debt Collector" as Defined in the FDCPA

The FDCPA defines a "debt collector" as "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." 15 U.S.C. § 1692a(6); *see also Stafford v. Cross Country Bank*, 262 F.Supp.2d 776, 794 (W.D.Ky. 2003) (considering it "well settled" that "a creditor is not a debt collector for the purposes of the FDCPA and creditors are not subject to the FDCPA when collecting their accounts"). A "creditor" under the Act is "a person who offers or extends credit creating a debt or to whom a debt is owed." 16 U.S.C. § 1962a(4). Creditors who collect in their own name or whose principal business is not debt collection are not "debt collectors" subject to the FDCPA. *See MacDermid v. Discover Financial Svcs.,* 488 F.3d 721 (6th Cir. 2007).

Under the facts of this case and the FDCPA definition, the court finds that CitiFinancial is not a "debt collector," rather, it is the party to whom the debt is due. *See* 15 U.S.C. §§ 1692a(4), (6). Even though CitiFinancial had contracted with DRS to collect the Maynards' debt, this contractual relationship does not change the fact that neither CitiFinancial nor its employees are "debt collectors" under the FDCPA. Moreover, on June 26, 2008, the date on which Joe Maynard suffered a pneumothorax, CitiFinancial did not contact the Maynards. Thus, CitiFinancial could not have caused the Maynards' alleged injuries because CitiFinancial did not communicate with the Maynards on that day. Accordingly, the court finds that CitiFinancial is not liable on plaintiffs' claims under the FDCPA.

### B.  CitiFinancial's Liability for the Actions of DRS

The Maynards argue that CitiFinancial's liability is based not just on the actions of its own employees, but also on the actions of its agent, DRS, who employed Anderson.  CitiFinancial, however, argues that the agreement with DRS provided that DRS was an independent contractor, and required DRS to provide all services in a professional manner and in compliance with all applicable laws.  In addition, DRS was required to indemnify and hold CitiFinancial harmless for any breach of the agreement by DRS.  The court need not address whether CitiFinancial is vicariously liable for the actions of DRS, because pursuant to the terms of the agreement between DRS and CitiFinancial, DRS has agreed to indemnify CitiFinancial for the actions of its employees.  *See* Part XI below.

### V.  Tennessee Consumer Protection Act Claims

The Tennessee Consumer Protection Act (TCPA), prohibits "unfair or deceptive acts or practices affecting the conduct of any trade or commerce."  Tenn. Code Ann. § 47-18-104.  The TCPA applies only to conduct involving the "advertising, offering for sale, lease or rental, or distribution of any goods, services or property . . . ."  Tenn. Code Ann. § 47-18-103(19).  The Tennessee Supreme Court has determined that the TCPA does not apply to the repossession of a vehicle or to other acts related to disposing of a vehicle. *See Purcell v. First American Nat'l Bank,* 937 S.W.2d 838 (Tenn. 1996); *Hunter v. Wash. Mut. Bank*, 2008 WL 4206604 (E.D.Tenn. Sept. 10, 2008) ("the TCPA does not apply to repossession and collateral disposition activities").

Case 3:09-cv-00334-TWP-HBG   Document 53   Filed 08/01/11   Page 16 of 26   PageID #: 711

CitiFinancial was the creditor to whom the Maynards owed a debt. The Maynards had partially performed their obligation, but they admitted that they stopped making payments and offered to surrender the vehicle. CitiFinancial periodically contacted the Maynards in an effort to collect its debt. CitiFinancial contracted with DRS to engage in debt collection efforts regarding the deficiency owed on the Maynards' installment contract. Since CitiFinancial's actions arose from the repossession of the vehicle and other acts related to disposing of the vehicle, which are not actionable under the TCPA, plaintiffs have failed to state a cause of action against CitiFinancial under the TCPA.

## VI.  Negligence Claims

The Maynards allege in their amended complaint that as a direct and proximate result of the repeated calls and harassing techniques used by the defendants and their employee, Anderson, on June 26, 2008, Joe Maynard (1) suffered a pneumothorax, (2) had to be transported to the hospital, (3) underwent medical treatment and procedures, (4) incurred medical expenses, and (5) endured pain and suffering. The Maynards allege that the phone call from Denise Anderson, an employee of DRS, on June 26, 2008, was the actual and proximate cause of Joe Maynard suffering the pneumothorax and resulting hospitalization.

To succeed on a claim for negligence, the Maynards must show that (1) defendant owed them a duty of care, (2) defendant's conduct fell below that standard of care such that it constituted a breach of duty, (3) defendant's actions actually caused the injury or loss, (4) defendant's actions proximately caused the injury or loss, and (5) plaintiffs

17

actually suffered an injury or loss.  *See Staples v. CBL Assoc.*, 15 S.W.3d 83, 89 (Tenn. 2000).  "Gross negligence" is a variant of ordinary negligence and requires that the defendant's conduct is intentional wrongful conduct, done either with knowledge that serious injury to another will result, or with a wanton and reckless disregard of possible results.  *Thomason v. Wayne County*, 611 S.W.2d 585, 587 (Tenn.Ct.App. 1990).

Here, plaintiffs have failed to produce any evidence showing that CitiFinancial breached the ordinary duty of care it owed to the Maynards.  By Wanda Maynard's own admission, CitiFinancial's communications with the Maynards were respectful and professional.  Also, plaintiffs have not shown that any actions by CitiFinancial were the actual or proximate cause of their injuries.  It is undisputed that a DRS employee contacted the Maynards on June 26, 2008.  CitiFinancial did not call the Maynards on June 26, 2008, the date of the Maynards' alleged injuries, and thus, CitiFinancial's acts cannot be the actual cause or proximate cause of the Maynards' alleged injuries.

## VII.   Failure to Train and Supervise

The Maynards allege in their amended complaint that the defendants were negligent in failing to properly train and supervise their employees, specifically Denise Anderson.  In order to succeed on a claim of negligently failing to train and/or supervise employees, plaintiffs must first establish (1) evidence of unfitness for the particular job, (2) evidence that the applicant for employment, if hired, would pose an unreasonable risk to others, and (3) evidence that the prospective employee knew or should have known that

Case 3:09-cv-00334-TWP-HBG   Document 53   Filed 08/01/11   Page 18 of 26   PageID #: 713

the historical criminality of the applicant would likely be repetitive. *Gates v. McQuiddy Office Products*, 1995 Tenn.App.LEXIS 715, *2 (Tenn.Ct.App. Nov. 2, 1995).

The Maynards' claim against CitiFinancial for failure to train and/or supervise fails because they have not shown that a CitiFinancial employee engaged in the conduct at issue. Instead, it was a DRS employee who telephoned the Maynards on June 26, 2008. Moreover, CitiFinancial's agreement with DRS provided that it was to comply with all federal and state laws and regulations. Accordingly, the court finds that CitiFinancial has no liability for plaintiffs' failure to train and/or supervise claims.

## VIII.   Intentional Infliction of Emotional Distress

The Maynards assert that the actions of Anderson constitute intentional infliction of emotional distress. The Maynards further assert that the actions of Anderson are imputable to defendants CitiFinancial and DRS. To establish a claim for intentional infliction of emotional distress, plaintiffs must show that defendants' conduct was "(1) intentional or reckless, (2) so outrageous that it cannot be tolerated in a civilized society, and (3) the cause of serious mental injury to the plaintiffs." *Bain v. Wells,* 936 S.W.2d 618, 633 (Tenn. 1997). In determining whether conduct is "outrageous," courts are instructed to follow the Restatement (Second) of Torts:

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go

19

> beyond all bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.

Restatement (Second) of Torts, Section 46, Comment D.  Under this high standard, "mere insults, indignities, threats, annoyances, petty oppression or other trivialities" are not recognized as "outrageous."  *Bain,* 936 S.W.2d at 622.

Expert testimony is not necessary to establish the existence of a serious mental injury.  *Miller v. Willbanks*, 8 S.W.3d 607, 614 (Tenn. 1999).  However, the mental injury must be "so severe that no reasonable person would be expected to endure it." *Arnett v. Domino's Pizza I, LLC*, 124 S.W.2d 529, 540 (Tenn.Ct.App. 2003).  Physical manifestations of emotional distress – though not required to sustain a claim – may serve as proof of serious mental injury.  *Miller*, 8 S.W.3d at 615.  "Moreover, evidence that a plaintiff has suffered from nightmares, insomnia, and depression or has sought psychiatric treatment may support a claim of serious mental injury."  *Id.*  The intensity and duration of the mental distress "are also factors that may be considered in determining the severity of the injury."  *Id.*

The Tennessee Supreme Court has stated that with respect to creditor-debtor interactions, "the general rule is that a creditor has a right to urge payment of a just debt, and to threaten to resort to proper legal procedures to enforce the obligation."  *Moorhead v. J.C. Penney Co.,* 555 S.W.2d 713, 718 (Tenn. 1977).  A creditor is not liable for a mental or emotional disturbance, or for a bodily injury or illness, as a result of his attempt to collect a debt by reasonable means.  *Id.*  Nevertheless, "improper methods used to collect a debt

may be the basis for the maintenance of an action for a mental or emotional disturbance produced thereby, or for a bodily injury or illness resulting from such mental or emotional disturbance, especially where the circumstances attending the effort to collect the claim are such as to invoke the general rule that one who willfully or intentionally causes great emotional distress without justification is liable for such injuries." *Id.*

Improper methods include intentionally threatening a person in a manner that the creditor knows will exacerbate an existing medical condition and threatening criminal action or unlawful acts. *Id.  See also Searle v. Harrah's Entm't,* 2010 WL 3928632 (Tenn.Ct.App. Oct. 6, 2010) (falsely claiming criminal warrant had been filed against debtor); *Lawrence v. Stanford,* 655 S.W.2d 927, 930 (Tenn. 1983) (holding that improper methods of debt collection include threatening to kill debtor's dog).

Viewing the facts in the light most favorable to the plaintiffs, the court finds that no reasonable jury could find that CitiFinancial's conduct rises to the level of outrageous conduct.  Wanda Maynard admitted that CitiFinancial did not threaten the Maynards.  The record shows that CitiFinancial's conduct was a reasonable attempt to collect a debt, and, when the Maynards could not meet their contractual obligations, CitiFinancial attempted to help the Maynards by reducing their payments and the principal balance.  Moreover, the Maynards have not shown serious mental or emotional disturbance attributable to the actions of CitiFinancial.  Accordingly, the court finds that CitiFinancial is not liable on the plaintiffs' claims for intentional infliction of emotional distress.

## IX.   Negligent Infliction of Emotional Distress

The Maynards allege in their amended complaint, that the defendants' actions also constitute the tort of negligent infliction of emotional distress. The Tennessee Supreme Court has enumerated the requirements for setting forth a claim of negligent infliction of emotional distress. There are five necessary elements: (1) duty; (2) breach of that duty; (3) causation in fact; (4) proximate cause; and (5) injury or loss. *Camper v. Minor,* 915 S.W.2d 437, 446 (Tenn. 1996). Moreover, a plaintiff must have sustained a "serious or severe emotional injury" which must be supported by expert medical or scientific proof. *Id.* A "serious" or "severe" emotional injury occurs "where a reasonable person, normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the case." *Id.*

As stated above, plaintiffs cannot show that CitiFinancial breached any duty to them. Wanda Maynard testified that CitiFinancial treated them with respect and professionalism. CitiFinancial's conduct cannot be the cause in fact of the Maynards' injuries, because CitiFinancial did not make the telephone call that is the source of the Maynards' alleged injuries. Accordingly, the court finds that CitiFinancial is not liable on plaintiffs' claims for negligent infliction of emotional distress.

## X.  Loss of Consortium

The Tennessee Supreme Court has held that a spouse's loss of consortium claim is a derivative claim in that it is based on the physical injuries or incapacities of the other spouse. *Tuggle v. Allright Parking Sys.,* 922 S.W.2d 105, 108 (Tenn. 1996). In order

for Wanda Maynard to recover on her loss of consortium claim, Joe Maynard must prevail on his action for recovery of his injuries allegedly sustained as a result of the June 26, 2008 telephone call. *See* Tenn. Code Ann. § 25-1-106. Because the court has found that CitiFinancial is not liable for any of plaintiffs' claims in this action, Wanda Maynard's claim for loss of consortium against CitiFinancial fails as a matter of law.

## XI.  CitiFinancial's Cross-Claim Against DRS

CitiFinancial has moved for summary judgment on its cross-claim against DRS. In support of its motion, CitiFinancial states that pursuant to the agreement between CitiFinancial and DRS, DRS was required to provide services in a professional manner and comply with all applicable laws. In addition, CitiFinancial states that DRS was required to indemnify and hold CitiFinancial harmless for any claimed breach of the agreement. CitiFinancial has made demand upon DRS to defend it and indemnify it by letter dated August 19, 2009. Therefore, CitiFinancial argues it is entitled to judgment as a matter of law against DRS for breach of contract, and for its fees and expenses in defending this action.

DRS opposes the motion, stating that CitiFinancial is not entitled to summary judgment because the Maynards have asserted claims against CitiFinancial based on CitiFinancial's conduct, separate and independent form DRS's conduct, prior to June 2008. However, as stated above, the court has found that plaintiffs have failed to establish any of their claims against CitiFinancial. DRS admits that it is required to indemnify CitiFinancial for actions undertaken by DRS employees.

23

In Tennessee, "indemnification requires the complete shifting of liability for loss from one party to another" and rests on two principles: persons should be responsible for their own wrongdoing and wrongdoers should be liable to persons required to pay damages that the wrongdoers should have paid. *Winter v. Smith*, 914 S.W.2d 527 541 (Tenn.Ct.App. 1995); *see also Owens v. Truckstops of Amer.,* 915 S.W.2d 420, 433 (Tenn. 1996). When a third party's wrongful conduct causes a defendant to be liable to a plaintiff, the defendant is entitled to indemnification from the third party. *See Houseboating Corp. of Amer. v. Marshall*, 553 S.W.2d 588, 589 (Tenn. 1977) ("The right to indemnify rests on the principle that everyone is responsible for the consequences of his own wrong, and if another person has been compelled to pay the damages which the wrongdoer should have paid, the latter becomes liable to the former") (quoting *S. Coal & Coke Co. v. Beech Grove Mining Co.,* 381 S.W.2d 299, 302 (Tenn.Ct.App. 1963)).

Under Tennessee law, an obligation to indemnify may arise expressly by contract between the parties or impliedly from the parties' relationship. *Id.; Farmers Mut. of Tenn. v. Athens ins. Agency,* 145 S.W.3d 566, 568 (Tenn.Ct.App. 2004); *Winter,* 914 S.W.2d at 541. For indemnification to arise expressly by contract, "there must be a clear and unequivocal expression of an intention to indemnify." *First Amer. Bank of Nashville N.A. v. Woods*, 734 S.W.2d 622, 632 (Tenn.Ct.App. 1987).

The record reflects that CitiFinancial referred the Maynards' account to DRS on May 28, 2008. In June of 2008, CitiFinancial did not employ anyone named Denise Anderson, and based on its agreement with DRS and its assignment of the Maynard's

24

account to DRS, any communications with the Maynards on June 26, 2008 were conducted by DRS. DRS has admitted employing Denise Anderson, and admitted that she contacted the Maynards on June 26 2008.

The court finds that CitiFinancial is entitled to judgment as a matter of law on its indemnity claim because their contract requires DRS to indemnify CitiFinancial for any claims asserted against it that were the result of actions taken by DRS. The parties' agreement provided that DRS was an independent contractor, and DRS was required to provide all services in a professional manner, and in compliance with all applicable laws. In addition, DRS was required to indemnify and hold CitiFinancial harmless for any claimed breach of the agreement by DRS. Accordingly, CitiFinancial is **GRANTED** summary judgment against DRS on its claim for indemnification. However, because plaintiffs asserted claims against CitiFinancial based on CitiFinancial's conduct, separate and independent of DRS's conduct, the motion for attorney fees and expenses incurred defending this action is **DENIED.**

## XII.  Conclusion

For the reasons stated above, defendant CitiFinancial Auto Credit's motion for summary judgment on its cross-claim against DRS [Doc. 31] is **GRANTED** as to its indemnification claim, and **DENIED** as to its claim for attorney fees and costs. Because the court has found that CitiFinancial is not liable for any of the Maynards' claims, any amount

CitiFinancial agreed to pay to the Maynards in settlement that is not covered by the parties' agreement, is to be paid by DRS.

The final pretrial conference scheduled for August 1, 2011, and the trial scheduled for August 2, 2011 are **CANCELLED.**

**IT IS SO ORDERED.**

ENTER:
s/ Thomas W. Phillips
United States District Judge